## CHRISTIAN v. R. HOE & CO., Inc.
### No. 232.

Circuit Court of Appeals, Second Circuit.
Feb. 20, 1933.

Samuel Zirn, of New York City (Adolph Feldblum, of New York City, of counsel), creditor-appellant in Person, and attorney for Independent group of 7 per cent. note holders and class A stockholders.

Edwards, Breckenridge & Noble, of New York City (Francis O. Noble, of New York City, of counsel), for plaintiff-appellee.

Hughes, Schurman & Dwight, of New York City (Frank C. Fisher and Curtiss E. Frank, both of New York City, of counsel), for Irving Trust Co., permanent receiver in equity of R. Hoe & Co., Inc., receiver-appellee.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland, Theodore Kiendl, Leighton H. Coleman, and Franklin H. Mills, all of New York City, of counsel), for Guaranty Trust Company of New York, named as appellee, only in appeal No. II.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

These appeals have been consolidated in one record and have been argued together.

The appellant is a note holder and a class A stockholder who appeared on the return day of the order to show cause why the receivership of the defendant should not be made permanent. He opposed the application unsuccessfully and appeals. He is rightfully here, like a defendant who is summoned by process of court and after an adverse ruling has the right to appeal. Hinckley v. Gilman, 94 U. S. 467, 24 L. Ed. 166; Mitchell v. Lay, 48 F.(2d) 79 (C. C. A. 9); Kingsport Press, Inc., v. Brief English Systems, Inc., 54 F.(2d) 497 (C. C. A. 2); Johnson v. Manhattan R. R. Co., 61 F.(2d) 934 (C. C. A. 2).

The appeal from the first order, of June 21, 1932, which we shall refer to as appeal No. I, granted application to make the receivership permanent as well as providing for the appointment of attorneys. While the appeal has been pending, there has been a substitution of attorneys for the receivers, and Mr. Swartz has resigned as one of the receivers, leaving the Irving Trust Company sole receiver. Whether or not the attorneys or Mr. Swartz were wrongfully appointed has now become academic. The events leading up to the appointment of the receivers are referred to in the appeal of Polak, decided this day, 63 F.(2d) 221, and we need not again refer to them in this opinion.

On the day the order to show cause why the receivership should be made permanent was considered, this appellant appeared, stating that he appeared in his own behalf and in behalf of other note holders. He submitted a voluminous affidavit stating objections decided upon after having been accorded access to the books and papers of the defendant. He asked to be heard in support of his affidavit and opposition, but the court refused to hear oral argument and directed a submission and service of a copy of his affi-

davit the following day, and permitted answering affidavits, by the sponsors of the receivership, together with briefs. The court granted the application for a permanent receivership without taking testimony as to the allegations set forth in the affidavit in opposition although requested to do so.

On the same day, June 14, 1932, an application was made for an order authorizing the receivers to make a settlement with the Guaranty Trust Company, in regard to its secured bank loans, whereby the Guaranty Trust Company was permitted to retain and apply $86,000, nearly all the defendant's bank balance which was seized by the bank at the time of the appointment of temporary receivers, and authorized the receivers to forthwith pay over $143,000 more, in its hands, collected by them on accounts receivable, which accounts, it was claimed, had been pledged with the Guaranty Trust Company, and further authorized payment to the Guaranty Trust Company, of all sums thereafter collected by the receivers on such accounts which had been pledged. The appellant opposed this application, but was overruled, and, from an order entered thereon, he has appealed, and this we refer to as appeal No. II.

The affidavit of this appellant was made after an examination of the books and records of the defendant corporation, and there is little denial of the statements contained therein. Indeed, some of the affidavits in opposition and the exhibits, particularly the receivers' report, corroborate appellant's claims which he relies upon in prosecuting this appeal. He says in his affidavit that between May 12, 1932, and June 14, 1932, he examined official and authentic records and documents of the defendant and interviewed the responsible officers who knew the defendant's business and its financial condition. He points out the preparations made for the institution of the receivership proceeding, much of which we have set forth in the opinion in the Polak appeal. He presents an issue as to an alleged conspiracy which placed this corporation in receivership for selfish purposes, and alleges that the corporation was sufficiently solvent to withstand the loss which it sustained during the past years; that it could, if properly managed, have paid the bond interest and have avoided a default in that mortgage.

The corporation was organized in October, 1924. It acquired the assets and good will of its predecessor, R. Hoe & Co., for which a group of bankers paid $7,750,000. The business had been established by the inventor of the modern printing press, Robert Hoe, in 1818; it had continued up to this time as a highly successful enterprise. It had enjoyed good repute in the products it manufactured, and its trade-mark had won world-wide prestige and good will. The capital structure was as follows: 80,000 shares of class A stock (increased later to 96,000), preferred as to $65 per share and cumulate dividends of from $4 to $6 annually; 160,000 shares of unlisted common stock which the bankers retained as their profit, save for one-third portion which was issued to a member of the Hoe family, and which was granted exclusive voting power, except that upon four successive dividend defaults of the A stock the A stockholders had the right to control by the election of the majority of the board of directors. The defendant issued first mortgage bonds to the amount of $4,500,000, now reduced to $3,171,000, secured by its assets, including the stock of the completely owned British subsidiary; a 7 per cent. note issue of $800,000, which was subscribed for by the class A stockholders. Both issues are due October 1, 1934. There was a first and second real estate mortgage of $551,000 on the main plant of the defendant corporation in New York City. The control was obtained by ownership of two-thirds of the common stock. The corporation never defaulted in the payment of principal or interest on any of the funded debt issues until the board of directors resolved prior to the due date that there should be a default on April 1, 1932. The bonds and class A stock were marketed to the public by three banking houses, all engaged in the business of underwriting or purchasing security issues and marketing them to the public. The Guaranty Company, a subsidiary of the Guaranty Trust Company, took a 50 per cent. interest in the undertaking. The bonds were marketed at 99½ per cent. of par, and in June, 1932, were selling at about 8 per cent. thereof. Class A stock was sold at $50 a share, and in June, 1932, was selling at 50 cents a share, and the notes were selling at 4 per cent. of par. Mr. Swartz was elected president of defendant shortly after the bankers took control at a very much increased salary over that of his predecessor. The company made a net profit for each year, except in 1927 and 1928, at which time the loss was much less than the depreciation charged off. Profit averaged $7 per share on the A stock and about three times the interest charges on its entire funded debt. For five years, 1926 to 1930, inclusive, the defendant showed a consolidated net profit of $1,000,000 beyond

the small losses of 1927 and 1928. The 1931 earnings, as issued a week after the resolution of default referred to, showed a net loss of $594,000, but this, it is said, was largely a bookkeeping loss. The appellant claims it was exaggerated and not a real loss, and there is evidence to sustain this statement. In that year $275,000 was deducted for British income taxes, although the British company had earned nothing in 1931 to be taxed and the defendant in previous years in its statement had allowed one-third of the accumulated income taxes annually for the British taxes which were payable over a period of three years. There was deducted $140,000 for additional reserves for doubtful accounts, although the balance sheet already had a reserve of $90,000 for this item, equal to 3 per cent. of the accounts and notes receivable. There was charged off $150,000 out of $240,000 spent for development expenses during 1931, which is the initial cost of developing and preparing new and improved models based on improved patents, and the appellant argues that this item should be spread over a period of four years or more. With these criticisms of the 1931 earnings report, it might well be that the true earnings, as argued, would result in a net loss of about $95,000 instead of $594,000. This would but equal two-fifths of the depreciation charge of $242,000—a bookkeeping deduction and not an actual expenditure. The report of the Irving Trust Company receiver, submitted to the District Judge on June 14th, attaches a balance sheet as of May 31, 1932, of the defendant corporation alone, which excludes the resources of the free and clear owned British subsidiary, and this shows total current assets of $2,127,000, including $152,000 cash, in addition to the $756,000 receivables pledged in excess of bank loans against $78,000 of current liabilities. The pre-receivership liabilities were about $152,000. Thus the current liabilities were about $230,000, with current assets to liability on a ratio of 9 to 1, and this does not take into account the $756,000 item of excess receivables pledged.

The trust indenture of the bond and note issues had a 90-day grace clause as to payment of interest. The corporation had sufficient moneys in the bank which, together with the excess of collateral it had the right to withdraw from the Guaranty Trust Company on the loan, might have been used for the payment of interest and would have avoided a default on that mortgage.

■ Upon a consideration of these facts and the circumstances under which the application for receiver was made in the federal court, referred to more fully in the Polak appeal, it is clear that the appellant was entitled to a full hearing on the return of the motion to make the receivership permanent. He should have been permitted to call such witnesses and introduce such exhibits as he might to establish the solvency of the defendant and its ability to meet its obligations currently accruing and thus avoid the appointment of a receiver.

Appellant's position is different from that of Polak. He argues that a receiver is not necessary and that the affairs of the company rightfully belong in the hands of its directors. The issues in the Polak suit show a race to outwit Polak in obtaining a receivership of the defendant. This appellant contends that the best interests of the stockholders of the corporation would be to avoid a receivership.

■ As stated in the Polak appeal, the indebtedness upon which the plaintiff sued was not due. The allegations of the complaint refer to the schedules which show that the defendant had an unexpired 30 days' credit to pay the obligation of plaintiff's assignor. They refer to schedules B, C, and D, which are not part of the record, but which were submitted on the argument in original form, and which, upon examination, disclose a 30 days' credit. It is suggested in the appellee's brief that this obligation was due at the time the suit was commenced. Whether that be so, the majority of the court think this defect has been cured because the bill was due before the order was entered.

■ We think appeal No. II must be dismissed. The order was an administration order which did not purport to settle finally the rights between the Guaranty Trust Company and the receivers or the defendant. This order will be as any administration order entered, and may be subject to the final disposition of this suit and the practice to be followed as stated in the Polak appeal.

Our disposition of the Polak appeal permits that appellant proceed in the state court for the appointment of a receiver. In the event that a receivership is granted there, it will require a dismissal of this suit, but, if the application for the receiver be denied and the plaintiff proceeds in prosecuting this suit, this appellant should be accorded a full opportunity to present objections to making the receivership permanent. His claims are sufficiently substantial to permit him to offer proof and argument showing the lack of sufficient reason for the receivership.

The order appointing the receiver perma-

nently will be reversed, but the receiver may hold the property temporarily until the disposition of the Polak Case in the state Supreme Court in accordance with the opinion rendered this day in the Polak Case.

Order reversed and remanded to proceed in accordance with this opinion.